UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § § § | |
| Plaintiff, | § § | |
| v. | § § | CASE NO. 6:23-CR-00177-ADA |
| **(1) WILLIAM JEFFERSON BROWN JR.,** | § § § | 6:20-CR-00148-ADA |
| Defendant. | § § § | |

**REPORT AND RECOMMENDATION OF**
**THE UNITED STATES MAGISTRATE**

TO:   THE HONORABLE ALAN D ALBRIGHT,
      UNITED STATES DISTRICT JUDGE

This Report and Recommendation is submitted to the Court pursuant to 28 U.S.C. § 636(b)(1)(c) and Rules 1(h) and 4(b) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges.

Before the Court is Defendant's Motion to Suppress. ECF No. 31 in Case No. 6:23-CR-00177 and ECF No. 61 in 6:20-CR-00148-ADA. The United States responded, and the Court heard oral arguments on Defendant's Motion on July 24, 2024. The Government called four witnesses: Detectives Roderick Mack, Detective Christopher Heeder, Officer Justin Asmus of the City of Killeen Police Department, and Officer Jeremy Stevens of the Baytown Police Department. The Court admitted four exhibits from the Government: Exhibit 1, body camera video footage from Officer Asmus; Exhibit 2, Killeen Police Department radio recording; Exhibit 3, Police Service Dog Certification Record from the National Narcotic Detector Dog Association Inc. ("NNDDA"); and Exhibit 4, Narcotics Certification Record from the NNDDA.

Defendant did not call any witnesses. For the reasons discussed below, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress be **DENIED**.

## I. BACKGROUND

Brown is charged with the offense of being a felon in possession of a firearm, in violation of 18 U.S.C. Sections 922(g)(1) and 924(a)(8) in Case No. 6:23-CR-00177, and with a Motion to Revoke his Supervised Release in 6:20-CR-00148-ADA based on this same firearm charge. Those charges all stem from a traffic stop that occurred on September 7, 2023 and ended in the arrest of Defendant William Jefferson Brown, Jr. ECF No. 31 at 1.

At the suppression hearing, the Government heard the testimony of the Government's four witnesses. Detective Mack testified that earlier in the day on September 7, 2023, he received a call from a confidential informant stating that narcotics were to going to be delivered to and sold from a residence in Killeen. The confidential informant was in the residence at the time of call. Detective Mack set up surveillance of the residence with support from Detective Heeder and Officer Asmus. Detective Mack observed the vehicles parked at the residence, ran their license plates and residence information through the police databases, which came back showing the residence's owners being two brothers that had extensive criminal histories involving the sale of narcotics. Detective Mack also testified that the informant stated that he was at the residence but would be leaving by a rideshare before the narcotics were to arrive. Detective Mack observed the informant leave the residence in a vehicle that appeared to be a rideshare vehicle. Detective Mack testified that he then observed several people enter and leave the residence during an approximately two minutes period. Based on his training, Detective Mack believed the conduct had the hallmarks of narcotic sales. Detective Mack testified that the standard procedure for a

narcotics surveillance operation is to surveil vehicles after they leave the residence and, if they observe a traffic violation, use a marked police car to make a stop.

As a result of the surveillance, Defendant Brown was the second person stopped after visiting the residence. Detective Mack testified that another individual who had left the residence was stopped and arrested for possession of methamphetamine before Defendant Brown was stopped. Shortly after that individual left the residence, Detective Mack observed Defendant Brown arrive at the residence, get out of his vehicle carrying a backpack, and go into the residence. Detective Mack stated that the backpack was consistent with drug trafficking to occur in the house. After staying only a few minutes, Defendant Brown exited the residence, still carrying the backpack, and drove away. Detective Mack then radioed his colleague, Detective Heeter, and told him that Defendant Brown left the residence and gave him the description of Defendant Brown's vehicle.

Detective Heeter saw Defendant Brown commit a traffic violation. Detective Heeter testified that he followed Defendant Brown in an unmarked police vehicle. As he followed Defendant Brown, Detective Heeter saw Defendant Brown fail to stop at a designated stopping point at the intersection of Westcliff and 60th streets. Detective Heeter stated that Brown failed to stop before the crosswalk and the stop line, which is a violation of the Texas Traffic Code. Detective Heeter relayed the traffic violation by radio to K9 Officer Asmus.

After being told of the infraction, Officer Asmus stopped Defendant Brown. After Detective Heeter relayed the traffic violation to Officer Asmus, Officer Asmus initiated a traffic stop. He asked for Defendant Brown's driver's license and proof of insurance, but Brown could only provide the license. *See* Exhibit 1 (Asmus body cam footage) at 1:36. For the next two minutes, Officer Asmus asked Defendant Brown about his actual address and the address listed

on his driver's. Officer Asmus also continued to ask for proof of insurance. *See* Ex. 1 at 1:36-3:42. Defendant Brown said that he would need to text his wife to get proof of insurance. Officer Asmus asked Defendant Brown to exit the vehicle and move to the sidewalk area for safety purposes. Exhibit 1 at 3:43. Defendant Brown initially refused to step out of the vehicle, called his wife, and argued with Officer Asmus about whether he needed to exit the vehicle. *See* Ex. 1 at 3:43-6:37. Defendant Brown finally agreed to exit the vehicle about six and a half minutes into the traffic stop—at the 6:40 mark of the body cam footage. For the next two minutes, Defendant Brown engaged in a continuous conversation with Officer Asmus. Ex. 1 at 6:37-8:30. Defendant Brown then explained to Officer Asmus that he was reaching for a bag when he was initially pulled over, he then continued to engage Asmus in conversation, and about ten minutes into the stop—10:10 mark of the body cam footage—Brown's wife sent a screenshot of Brown's proof of insurance that was shown to Asmus. Ex 1 at 8:30-10:10.

Over the next few minutes, Officer Asmus conducted additional inquiries of Defendant Brown. He asked Defendant Brown if there were any weapons, narcotics, or cash in the vehicle, which Brown denied. Ex 1 at 10:10-12:13. About twelve minutes into the stop—at the 12:14 mark on the footage—Asmus asks for consent to search the vehicle, which Brown denies. Officer Asmus then tells Brown that he is going have his canine perform a free-air sniff of the car, which began approximately 13 minutes into the stop. Officer Asmus canine alerted on the driver's side door of the car approximately 14 minutes into the stop. Ex 1 at 14:01. Based on the alert, Officer Asmus searched the car and found a Colt Python .357 revolver in a backpack in the passenger side of the vehicle. Asmus then ran a driver's license check, warrant check, registration check, and criminal history check that showed that Defendant Brown was a convicted felon. Officer Asmus testified that he was unable to do the background searches before

the dog search occurred because he had been occupied with trying to get Defendant Brown out of the vehicle and obtaining proof of insurance. Officer Asmus testified that as a K-9 Officer, he runs the dog as part of a traffic stop and that he considered running the dog on Mr. Brown's car to be part of the traffic stop. He also testified that a great deal of the time spent on Defendant Brown's traffic stop was because of Defendant Brown's conduct as he was very talkative and took a while to get proof of insurance from his wife. .

The government proved up the narcotics dog's qualifications at the hearing. Officer Asmus testified to his dog's training and qualifications. Asmus testified that he and his dog, Lincy, had been together for 3 years. Officer Asmus and Linsy completed a 9 week handling academy training for both (1) narcotics detection and (2) general police service dog work, such as detecting objects and odors. Lincy was certified and recertified by the NNDDA in these areas. *See* Exhibits 3 and 4 (certification records). Officer Asmus testified that Linsy's reliability rating in 2022 was 78%, with 59 alerts that resulted in a find, compared to 13 without a find. The government also called Officer Stevens who testified that he certified Officer Asmus and Linsy, in 2021, recertified them in 2022, 2023, and 2024, and explained the certification tests in Exhibits 3 and 4.

## II.   LEGAL STANDARD

This Motion involves the Fourth Amendment and its protection against unreasonable searches and seizures. The protection of the Fourth Amendment "extends to vehicle stops and temporary detainment of a vehicle's occupants." *United States v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013). A traffic stop is more analogous to a *Terry* stop than to a formal arrest. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015); *see also Terry v. Ohio*, 392 U.S. 1 (1968). Under the two-part *Terry* reasonable suspicion inquiry, Courts must determine whether the officer's action

was: (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." *U.S. v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (citing *Terry*, 392 U.S. at 19–20).

The length of a stop cannot be indefinite. As with *Terry* stops, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez*, 575 U.S. at 354 (internal citations omitted). A traffic stop "may last no longer than necessary to address the traffic violation, and constitutional authority for the seizure 'ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.'" *United States v. Reyes*, 963 F.3d 482, 487 (5th Cir. 2020) (quoting *Rodriguez*, 575 U.S. at 354). Those tasks include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. "Officers may ask questions unrelated to the purpose of the stop while waiting for computer checks to process. But officers must diligently pursue the investigation of the traffic violation." *U.S. v. Reyes*, 963 F.3d 482, 487 (5th Cir. 2020) (internal citations omitted).

### III.   ARGUMENT

Defendant Brown argues the evidence should be suppressed for four reasons. First, he contends that the traffic stop lacked reasonable suspicion or probable cause. Second, he contends that the traffic stop was unreasonably prolonged beyond what was necessary. Third, he argues that the canine gave a positive alert to the presence of narcotics in the car, but no narcotics were found. Finally, Defendant Brown contends that the evidence should be suppressed as to his violation of supervised release and its revocation hearing. The Court takes each argument in turn.

**A.  The traffic stop did not lack reasonable suspicion or probable cause.**

Defendant Brown first argues that "the traffic stop lacked reasonable suspicion or probable cause." ECF No. 61 at 2-3. Defendant Brown claims that Officer Asmus did not personally observe the alleged traffic infarction, the stop was pretextual, and an evidentiary hearing is needed to establish that there was reasonable suspicion. ECF No. 31 at 3-4. Defendant Brown's motion concedes, and the testimony and evidence at the hearing confirmed, that Defendant Brown was stopped only after Detective Heeter observed Brown failing to properly stop at an intersection. Detective Heeter relayed that traffic violation to Officer Asmus.

In light of the evidence and case law, the Court is convinced that Defendant Brown was stopped for a legitimate traffic infraction. "For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, *such as a traffic violation*, occurred, or is about to occur, before stopping the vehicle." *U.S. v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (emphasis added). The traffic stop was therefore justified. That Officer Asmus did not personally observe the traffic violation does not change that. Reasonable suspicion to stop a vehicle can be based on information relayed to Officer Asmus by another officer. ECF No. 61 at 3; citing *U.S. v. Zuniga*, 860 F.3d 276, 282 (5th Cir. 2017). Defendant Brown's argument that the traffic stop was pretextual does not change this result. *See e.g. U.S. v. Escalante*, 239 F.3d 678, 680–81 (5th Cir. 2001) ("a traffic stop, even if pretextual, does not violate the Fourth Amendment if the officer making the stop has 'probable cause to believe that a traffic violation has occurred.') (citing *Whren v. United States,* 517 U.S. 806 (1996)). The traffic stop was justified at its inception based on Detective Heeter's credible testimony that Brown failed to stop at the appropriate location.

**B. The traffic stop was not unreasonably prolonged.**

Brown next argues that "traffic stop was unreasonably prolonged beyond what was necessary to effectuate any legal basis for the stop." ECF No. 31 at 4. Relying on the Supreme Court's decision in *Rodriguez v. United States*, 575 U.S. 348, 355 (2015), Brown argues that the dog sniff "either delayed the stop or resulted from the officer's failure to expeditiously conduct the routine tasks permissible as part of a traffic violation." ECF No. 31 at 5.

The Supreme Court outlined the requirements for the length of a traffic stop in *Rodriguez*. It stated that a traffic stop may last no longer than necessary to address the traffic violation, and constitutional authority for the seizure "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed*." Rodriguez v. United Stat*es, 575 U.S. 348, 354 (2015). Those tasks include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id*. at 355. By contrast, a dog sniff is not part of an ordinary traffic stop because it is directed not at traffic safety but "detecting evidence of ordinary criminal wrongdoing." *Id*. at 355–56.

That does not mean, however, that an officer is restricted from doing anything else during a traffic stop. During a traffic stop, officers may conduct additional investigations provided they diligently conduct the investigation of the traffic violation. *United States v. Reyes*, 963 F.3d 482, 487 (5th Cir. 2020). Officers cannot prolong a traffic stop just to conduct an additional investigation unrelated to the traffic violation, unless they have reasonable suspicion of other criminal conduct. *Id*. Where an "officer develops reasonable suspicion of [additional criminal] activity 'in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or

8

confirmed.'" *Id*. at 487–88 (quoting *United States v. Banuelos-Romero*, 597 F.3d 763, 767 (5th Cir. 2010)).

Reasonable suspicion requires consideration of all the facts and circumstances. To have a reasonable suspicion, an "'officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Reyes*, 963 F.3d at 488 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). This standard "takes into account the totality of the circumstances—the whole picture." *Kansas v. Glover*, 140 S. Ct. 1183, 1191 (2020). The reasonable suspicion standard requires "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Id*. at 1187 (2020) (internal quotation marks omitted).

Defendant Brown's argument fails because he was not detained beyond what was necessary for the traffic violation. Officer Asmus's testimony, and the video evidence submitted at the suppression hearing, showed that Officer Asmus had not concluded his traffic stop investigation when the dog sniff occurred. The majority of time spent on the traffic stop was because of Defendant Brown's conduct—inability to locate proof of insurance and a great deal of talking by Defendant Brown. The video shows that between Defendant Brown questioning Officer Asmus about having to exit the vehicle, Defendant Brown's delay in locating proof of insurance, and Defendant Brown engaging in small talk, Officer Asmus had not had the chance to conduct any investigation into Defendant Brown's license, insurance status, or warrant status. The Court finds that any delay up to the 13-minute mark of the traffic stop was primarily Mr. Brown's own doing, and the dog-sniff was conducted within a minute after that.

Defendant Brown's suppression motion fails for a second reason, as the dog sniff was supported by a reasonable suspicion of additional criminal activity. The testimony at the

9

suppression hearing showed that the officers were engaged in a drug interdiction and revealed several pieces of evidence supporting a reasonable suspicion, including the following:

- a review of the vehicles located at the residence came back with the identified owners being two brothers that had extensive criminal histories involving the sale of narcotics;

- a criminal informant contacted Detective Mack from inside the residence and told Detective Mack that narcotics were to be exchanged in the residence after the informant had left that day;

- Detective Mack saw the informant leave the residence as the informant said he would;

- Detective Mack saw several individuals visit the residence for very brief periods of times, which was consistent with narcotics dealing;

- Detective Mack's testified that another individual who was observed visiting the residence before Mr. Brown had been pulled over found in possession of methamphetamine;

- Defendant Brown was seen visiting the residence briefly while carrying a backpack, which was consistent with narcotics dealing; and

- While Mr. Brown was being pulled over, Officer Asmus observed Mr. Brown reaching over to secure something in the passenger area

Officer Asmus testified that he knew a narcotics interdiction investigation was taking place, he was in communication with his colleagues about what was occurring in the investigation, and based on the totality of the circumstances listed above, based on his training and experience he had a reasonable suspicion that Defendant Brown was engaged in other criminal activity beyond the traffic violation.

The Government argues that this case is analogous to *United States v. Reyes* and that Officer Asmus had a reasonable suspicion to justify extending a traffic stop. 963 F.3d at 485–86. In *Reyes*, an officer stopped a truck for speeding and called a canine unit about eight and a half minutes into the traffic stop. The canine unit did not arrive until about 32 minutes after the start

of the traffic stop. *United States v. Reyes*, No. 1:18-CR-054-C-1, Dkt. No. 127 at 23 (N.D. Tex. Apr. 25, 2019). The Fifth Circuit found that the government had presented specific and articulable facts to support the officer's reasonable suspicion. *Id.* at 488. Those facts included that the truck was on a drug-trafficking corridor and came from a city that was a known source of narcotics. The truck was not registered to the driver and had a temporary plate for a different state—activity that drug couriers engage in to avoid forfeiture. The driver was protective of the truck and initially refused to exit it. The driver offered inconsistent and implausible stories about the purpose of her travel. The driver had a conviction for methamphetamine. The driver responded evasively when asked if there was anything illegal in the truck; and the officer who stopped the truck drew on his training, education, and experience in narcotics interdiction and his familiarity with the area to determine there was a reasonable suspicion. *Id.* at 488–89. The Court agrees that this case is analogous to *Reyes* and that Officer Asmus has presented sufficient specific and articulable facts that clears the burden for a reasonable suspicion. *See also United States v. Pack*, 612 F.3d 341, 344 (5th Cir. 2010), *opinion modified on denial of reh'g,* 622 F.3d 383 (5th Cir. 2010) (finding reasonable suspicion to wait for a narcotics dog under similar circumstances).

The evidence adduced here justified the dog sniff. The evidence demonstrates that there was no delay in engaging the canine search because Asmus had the dog with him. The totality of the circumstances also demonstrate that Officer Asmus had a reasonable suspicion that justified any delay associated with the dog sniff. That is well within this Circuit's guidance provided in *Reyes* and *Pack*.

**C. The dog alert gave probable cause to search Brown's car.**

Defendant Brown also challenges the dog's reliability and requested an evidentiary hearing to determine whether Officer Asmus had sufficient basis to rely on the dog to establish probable cause. ECF No. 31 at 8. When a dog's alert is the basis for probable cause, as it is here, the question is not whether narcotics were actually found, but rather whether all of the facts surrounding the alert "would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris*, 568 U.S. 237, 248 (2013).

The Government presented evidence to show that the dog was certified by the National Narcotic Detector Dog Association Inc. ("NNDDA") in each of the past four years. Exhibits 3 and 4. Officer Stevens testified as to the training process and the dog's certification. Officer Asmus also testified to the dog's certifications and success rate. This is sufficient to provide probable cause for the search even though narcotics were never found. *See Harris*, 568 U.S. at 246-48 (upholding a search even though the substances on which the dog was trained were not found, but other illegal substances were found). Mr. Brown did not present any evidence to undermine the dog's reliability. *U.S. v. Daniel*, No. 23-30491, 2024 WL 1929013, at *5 (5th Cir. May 2, 2024). The Court therefore finds that the dog's alert was not unreliable, and Officer Asmus has a reliable basis to rely on his dog's alert.

### D. The Exclusionary Rule does not extend to revocation hearings.

Brown also seeks to exclude evidence of the firearm in his supervised release revocation proceeding. While Brown's brief does not articulate the point, by filing the motion in the supervised release proceeding, he is arguing that the exclusionary rule should extend to revocation hearings. The Government responds by stating that the exclusionary rule does not apply to revocation hearings. ECF No. 34 at 6.

12

The Court agrees that the exclusionary rule does not apply to Brown's supervised release revocation proceeding. The Fifth Circuit has been clear that absent a showing of police harassment, which is not applicable here, the exclusionary rule does not extend to revocation proceedings. *See United States v. Montez*, 952 F.2d 854, 857–59 (5th Cir. 1992) (holding "that the value to society of safely reintegrating former prisoners clearly outweighs whatever marginal benefit which might accrue from extending the exclusionary rule to supervised release revocation hearings which do not involve harassment"). At the suppression hearing, Brown's counsel conceded this point and was unable to find any contrary case law. As such, the exclusionary rule does not extend to Brown's revocation matter, and the Court **RECOMMENDS DENYING** Mr. Brown's suppression motion in his supervised release revocation proceeding, 6:20-CR-00148-ADA.

## RECOMMENDATION

The Court **RECOMMENDS DENIAL** of Defendant's Motion to Suppress in both cases: 6:23-CR-00177 and 6:20-CR-00148-ADA. The parties may wish to file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal

conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(l)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985).

SIGNED this 9th day of September, 2024.

_____
DEREK T. GILLILAND
UNITED STATES MAGISTRATE JUDGE